LYNCH v. BURT et al.

BURT et al. v. LYNCH et al.

(Circuit Court of Appeals, Eighth Circuit. August 24, 1904.)

Nos. 1,894, 1,895.

**1. JUDGMENT—ENTRY OF RECORD—NORTH DAKOTA STATUTE.**

Rev. Codes N. D. 1899, §§ 5479, 5487, 5488, require the clerk of the district court to keep among the records of the court a judgment book, in which the judgment in each case is to be entered by the clerk upon the order of the court or judge. In one court it was the practice for the clerk, as each order for judgment was made, to promptly write out the judgment with a typewriter upon separate sheets of paper of uniform size, to sign the judgment and affix the seal of the court, to number the sheets consecutively according to the chronological order in which the judgments were written out, and to place and securely keep these sheets in their proper order in a compact parcel in an inclosed box or case in the form of a book labeled "Judgment Book," until there should be sufficient of them to make a bound volume, when they were permanently bound together, preserving the same order, and with the same paging. *Held*, that such practice must be presumed to have been known to and approved by the court, and that the sheets as kept constituted a judgment book within the statutes, and a judgment from the time of its entry therein was as effective for all purposes as though entered in a bound volume.

**2. EXECUTION—PROPERTY SUBJECT TO SALE—RIGHT OF REDEMPTION IN LANDS.**

Under Rev. Codes N. D. 1899, §§ 5541, 5544, 5548, which gives a judgment debtor one year in which to redeem land from a sale on execution, during which time he retains the right of possession and the legal title, he has during such year a substantial interest in the property, which, under section 5507 of such Codes, as well as by the rule prevailing elsewhere, is subject to sale on execution.

**3. SAME—PROPERTY FRAUDULENTLY TRANSFERRED—NORTH DAKOTA STATUTE.**

Under Rev. Codes N. D. 1899, §§ 5052, 5080, which provide that every transfer of property with intent to defraud creditors is void as against all creditors of the debtor, and that one who has fraudulently dispossessed himself of property may be treated as though he still had possession, the title and ownership of property so transferred remains in the debtor, and is subject to levy and sale on an execution at law against him in like manner as though no transfer had been attempted. This is true, not only of transfers directly from the debtor made with such fraudulent intent, but also of transfers whereby his title and ownership are passed to another for the like dishonest purpose through the agency of a judicial sale.

**4. JUDGMENT ON COLLATERAL NOTE—SATISFACTION OF PRINCIPAL DEBT.**

A holder of two notes against the same maker, one of which is collateral to the other, and one having an indorser, is entitled to sue and recover judgment upon each; but the judgment upon the collateral note is also collateral, and is satisfied by a satisfaction of the principal judgment, and a sale of property thereunder after such satisfaction is wholly unauthorized.

**5. FRAUDULENT CONVEYANCE—SUBSEQUENT JUDGMENT AGAINST GRANTOR—NOT CONCLUSIVE UPON GRANTEE.**

A judgment against a grantor in a fraudulent conveyance, rendered subsequently to the conveyance, is not conclusive upon the grantee as to the existence or amount of the debt at the time of the transfer, because he cannot be prejudiced in respect of a pre-existing right by a judgment to which he is a stranger.

132 F.—27

**6. EXECUTION SALE—RIGHT OF REDEMPTION PURELY STATUTORY.**

The right of redemption from execution sales is purely statutory, and the extent or measure of the right is to be found in the statutory terms prescribing the time and method of its exercise and designating the persons who may exercise it.

**7. SAME—ENFORCEMENT OF RIGHT BY SUIT IN EQUITY AFTER EXPIRATION OF PRESCRIBED TIME.**

A statutory right of redemption may be enforced in equity, when its exercise in conformity with the statutory requirements is wrongfully denied, obstructed, or prevented, or where, before the right can be exercised, it is necessary to determine by judicial proceedings in whom the right rests, from whom the redemption can be made, or the amount requisite to effect it; but a redemption cannot be otherwise accomplished through a suit in equity after the expiration of the prescribed time.

**8. SAME—FACTS—RULING.**

The purchaser at an execution sale upon a judgment rendered in a state court brought a suit in equity in a federal court to have a prior conveyance declared fraudulent as to creditors and to have the title quieted, subject only to the right of the grantee to redeem from the execution sale, the time for which had not expired. The right of the grantee to redeem was clear and was conceded. It was well known that redemption could be made by payment to the sheriff, and the amount was readily ascertainable. Redemption was not made or offered to be made under the statute within the time prescribed, but on the day before the time expired the grantee paid into the registry of the federal court the requisite amount, to be there held to abide the final decree, without prejudice to the rights of the complainant. In that suit the grantee sought to entirely avoid the execution sale upon grounds which were obviously without merit and could not have been presented with any reasonable hope of success. Redemption was contemplated only in the event that the effort to sustain the fraudulent conveyance should fail and the execution sale should be sustained. *Held*, that the payment into the registry of the federal court was not the equivalent of redemption under the statute or of an offer thereof; that the course pursued was vexatious and devoid of honest purpose, and equity would not relieve from the failure to redeem under the statute and within the prescribed time.

**9. SAME.**

The same land was sold upon execution to satisfy each of two judgments for the same debt. The judgment creditor, who became the purchaser at each sale for the full amount of the judgment, acted in the belief that the judgments represented separate debts, and the circumstances tended to justify that belief. A grantee of the debtor under a prior conveyance made to defraud creditors knew, as did the debtor, for whom she was secretly acting, that the two judgments were for the same debt. The grantee sought to avoid both sales upon other grounds, and so to defeat a claim which she knew to be honest, rather than to redeem within the statutory period from the sale which was valid. *Held*, that the case was not one in which redemption could be enforced in equity after the statutory period had expired.

**10. EQUITY—ADVERSE EQUITIES PROTECTED BY GRANTING RELIEF UPON CONDITION.**

Adverse equities growing out of or closely connected with the subject-matter of a suit are protected by awarding a party the relief to which he is entitled only on condition that he accords to his adversary the corresponding right to which he also is entitled.

**11. FRAUDULENT CONVEYANCES—SETTING ASIDE IN EQUITY—REIMBURSEMENT OF GRANTEE FOR EXPENDITURES.**

A grantee in a fraudulent conveyance, who was a conscious participant in the fraud, on the setting aside of the conveyance is not entitled to recover expenditures made to protect his title; but one claiming through him in good faith, who did not participate in the fraud, although buying

under such circumstances as to be constructively chargeable with notice, is in equity entitled to be reimbursed for expenditures in the payment of taxes or prior liens.

**12. SAME—PURCHASER PENDENTE LITE—LIABILITY FOR COSTS.**

One who purchased an interest in land from a fraudulent grantee pending a creditors' suit to set aside the conveyance, and furnished money to redeem from a lien prior to that of the complainant, and also to enable his grantor to continue the litigation, in the belief that the title acquired was valid, is entitled on a decree for complainant to be reimbursed for the amount expended in paying off the prior lien with interest from the date of payment, and to be subrogated to all the rights of the holder of the lien discharged, although they may extend to lands other than those included in his purchase. On the other hand, although not a party to the suit until shortly before the decree, he is chargeable as against his claim for reimbursement with the taxable costs incurred in the suit after the date when he became a party in interest.

Appeal from the Circuit Court of the United States for the District of North Dakota.

George S. Grimes (Robert M. Pollock, on the brief), for Lynch, Dwinnell, and Grimes.

James B. Kerr, W. P. Warner, and Stiles W. Burr (D. G. Maclay and Charles G. Lawrence, on the brief), for Burt and Phipps.

Before SANBORN and VAN DEVANTER, Circuit Judges, and SHIRAS, District Judge.

VAN DEVANTER, Circuit Judge. These are cross-appeals from a decree declaring certain transfers and mortgages of lands in Steele county, in the state of North Dakota, fraudulent and void against the creditors of Bartholomew Pickert, quieting (subject to the performance of a prescribed condition) Lynch's title to these lands obtained through execution sales upon judgments against Bartholomew Pickert, and dismissing Burt's cross-bill seeking to have such execution sales declared unauthorized, fraudulent, and void, or, if they should be sustained, to effect a redemption therefrom. The printed record and the briefs of counsel are voluminous, the former covering 1,400 pages and the latter 500 pages. There is much conflict in the evidence, and counsel differ widely as to the facts proved and the rules of law applicable. The printed record and the briefs have been attentively read, and, with the oral arguments, have been carefully considered, but the reasonable limits of an opinion permit only a statement of what we deem to be the salient facts and the controlling principles of law.

January 20, 1892, Bartholomew Pickert, the owner of the legal title to the lands in controversy, embracing 10¼ sections, executed to the Pickert Land, Grain & Stock-Raising Company a deed for nine sections, but the deed was withheld from record until March 1, 1893. October 10, 1892, he executed to Fannie Pickert (now Fannie Snow), a brother's daughter, a $5,500 mortgage on the remaining section and a quarter. October 17, 1894, he executed to the same niece, upon the same lands, a $1,500 mortgage. This deed and these mortgages were without any consideration, and the purpose of their execution was to cover up Bartholomew Pickert's property and place it beyond the reach of his creditors. The execution and recording of the deed to the stock-raising

company were not followed by any change in the possession, control, or management of the nine sections, or by any change in the use of the income therefrom. June 12, 1896, all of these lands were sold to George S. Grimes under an execution upon a judgment recovered by Allen, Moon & Co. against Bartholomew Pickert, which had been a lien upon the lands since October 1, 1892. Grimes purchased for the benefit of Allen, Moon & Co., and bid the full amount of their judgment. A certificate of sale was issued to him by the sheriff, which was to be followed by a deed at the expiration of one year from the sale, if in the meantime the lands were not redeemed. June 9, 1897—three days before the expiration of the period for redemption—the sheriff's certificate was assigned to Flora J. Burt, and, there being no redemption during the year, a deed was executed and delivered to her by the sheriff. The amount paid to Grimes for the assignment of the sheriff's certificate was $790.34, the amount required to redeem from the sale. The lands were then worth more than $30,000 in excess of the only other bona fide incumbrance thereon. Bartholomew Pickert had an indebtedness of many thousand dollars, contracted in 1892, and, if he had openly redeemed from this execution sale, the unsecured holders of this indebtedness would have been thereby invited to enforce payment of their claims in the same way Allen, Moon & Co. had done. Burt did not purchase the sheriff's certificate with her own means or for her own benefit. She had never bought any land, had not seen these lands, and did not know their character or value, the extent to which they were incumbered, or the state of the title. She says she was led to make the purchase by overhearing conversations between Bartholomew Pickert and Rozel F. Pickert, his brother, and between them and attorneys with whom they conferred. The money with which the purchase was made was obtained from a prize package tea business, in which Bartholomew Pickert and Rozel F. Pickert were partners, but which was not conducted in their names. Burt had been and was an employé of the Pickerts in this business. Rozel F. Pickert personally attended to procuring the assignment to Burt of the sheriff's certificate. In this he was assisted by an attorney who was employed chiefly to ascertain whether the proceedings supporting the Allen, Moon & Co. judgment and sale were regular. Before the purchase of this certificate Rozel F. Pickert was Bartholomew Pickert's general agent, and acted for him in practically all the transactions relating to these lands, particularly in respect of the deed to the stock-raising company and the mortgages to Fannie Snow. Subsequently he acted in a like capacity for Burt. Nothing of importance relating to the lands was done by Bartholomew Pickert or by Burt except under Rozel F. Pickert's direction. His was the master mind in everything, whether relating to these lands or to the prize package tea business. There is a suggestion in the evidence that he may have been the secret owner of both at all times, and some of the contentions of counsel for Burt are predicated upon a hope that we will take that view of the evidence. However much such a conclusion may be supported by portions of the evidence when isolated from the remainder, it is not tenable when the pleadings and all of the evidence are considered. In their pleadings the parties unite in ascribing to Bartholomew Pickert full ownership

of the lands on January 20, 1892, and the evidence fully satisfies us that throughout the subsequent transactions it was the purpose of the Pickerts to secretly preserve the existing control and ownership, whether it was in Bartholomew, in Rozel F., or in both, and that, as between the Pickerts and Burt, this control and ownership underwent no change when the assignment to her of the sheriff's certificate was procured or when the sheriff's deed was issued to her. During the year 1892 Rozel F. Pickert, on behalf and in the name of Bartholomew Pickert, contracted the indebtedness hereinbefore named, including that which is the foundation of Lynch's title. In doing this he repeatedly represented that Bartholomew Pickert owned these lands, and extensive credit was extended to Bartholomew on the faith of that representation and ownership. March 23, 1897, in making a payment of $2,500 on behalf of Bartholomew Pickert upon a mortgage which constituted the only bona fide incumbrance upon the lands superior to the Allen, Moon & Co., claim, Rozel F. Pickert asked that the payment be not applied upon the mortgage debt for the time being, and expressed a desire that the mortgage should appear to still cover as large an amount as possible, as it might become advisable to acquire the mortgage and foreclose it as a means of getting the property straightened out as against other interests. July 9, 1897—30 days after Burt's purchase of the sheriff's certificate and 27 days after the expiration of the year of redemption—Rozel F. Pickert, in a letter to the same person, said, "The title has now been perfected since I saw you." Less than one-third of this $2,500 would have redeemed the lands from the Allen, Moon & Co. sale, but that would have subjected them, as before stated, to the claims of other creditors. If the fraud should not be detected, the title of Bartholomew Pickert could be apparently extinguished, and the collection of the demands of creditors probably prevented, by acquiring in the name of a third person the outstanding sheriff's certificate and obtaining a deed thereon upon the expiration of the redemption period, or by acquiring in like manner the prior mortgage and perfecting title through a foreclosure. Both methods were in the mind of Rozel F. Pickert, but he adopted the former. It required a much smaller immediate expenditure, and could be more readily and quickly consummated. It is perfectly clear that in effecting the purchase of the sheriff's certificate through Flora J. Burt with moneys obtained from the tea business, in which Bartholomew Pickert was a partner, Rozel F. Pickert was either acting for himself with intent to defraud his brother, who had clothed him with full authority to look after the lands, or was acting on behalf of his brother with intent to defeat his brother's creditors. His prior performances, the influence of kinship, and Bartholomew Pickert's participation in the attempt to sustain Burt's title, convince us that Rozel F. Pickert's cunning was directed against his brother's creditors, and not against his brother. The ultimate conclusion from the evidence is that in purchasing the sheriff's certificate and taking the sheriff's deed Burt was acting at the instance and on behalf of Bartholomew Pickert; that the money used therein was his money; and that the purpose of that transaction, as of those which preceded it, was to cover up his property, and place it beyond the reach of his creditors. In considering these same transactions, this

court, in Burt v. Gotzian & Co., 43 C. C. A. 59, 102 Fed. 937, while declaring the various transfers fraudulent and void as to creditors, expressed the view that Rozel F. Pickert was secretly the real owner of these lands at all times, that Burt's purchase of the sheriff's certificate was at the instance and on behalf of Rozel F. Pickert, and that the money used therein was his; but there is sufficient difference in the two cases as presented by the records made in the court below upon their separate trials to justify the somewhat different conclusion at which we arrive in this case. As will appear later, this difference is of some moment here, while in the Gotzian Case it could not affect the result, and was altogether immaterial.

August 17, 1892, Bartholomew Pickert, through Rozel F. Pickert, secured from the Bank of New England, at Minneapolis, Minn., a loan of $2,000, which was evidenced by his promissory note payable in four months. May 15, 1893, a new note for $2,133.34, the amount due on the first one, payable in 90 days, and indorsed by Rozel F. Pickert, was given to the bank by way of renewal. A small balance in the bank to the credit of Bartholomew Pickert was credited upon the new note, and the old note was retained by the bank as collateral. Upon the bank's subsequent failure the claim against the Pickerts passed to William S. Dwinnell through a receiver's sale. November 20, 1898, Dwinnell commenced separate actions upon these notes in one of the courts of North Dakota, and a judgment by default against Bartholomew Pickert was obtained in each action March 3, 1899. No reference was made in either judgment to the other, or to the fact that one note was held only as collateral security to the other. Thus there were two judgments and but one debt. November 10, 1899, all the lands before mentioned were sold under each of two executions, one issued upon each of these judgments, and Dwinnell purchased at each sale for the full amount of the judgment. A certificate of each sale was issued to him by the sheriff. December 5, 1899, Dwinnell filed in the court below a bill in equity against the Pickert Land, Grain & Stock-Raising Company, Fannie Snow, and Flora J. Burt, to have the deed to the stock-raising company, the mortgages to Snow and the assignment of the sheriff's certificate to Burt and the sheriff's deed to her declared fraudulent and void as to the complainant, and to quiet his title obtained through the execution sales upon his judgments, subject only to the existing right of redemption from execution sales under the laws of the state of North Dakota. During the pendency of this suit Dwinnell sold and assigned his two sheriff's certificates to Frank Lynch, and the latter was on January 21, 1901, permitted to file in the suit an original bill in the nature of a supplemental bill, and was substituted as complainant in place of Dwinnell. Lynch's bill was, in effect, the same as that of Dwinnell, save that, more than one year—the statutory time for redemption—having elapsed since the execution sales on the Dwinnell judgments, Lynch sought to have his title under these sales quieted absolutely, and not subject to any right of redemption. The decree declares the deed to the stock-raising company and the mortgages to Snow fraudulent and void as to the creditors of Bartholomew Pickert, and quiets Lynch's title as against them. There is no appeal by the stock-raising company or Snow, and, as none

of the appellants claim through or under this deed or either of these mortgages, further consideration need not be given to them.

October 11, 1898, C. Gotzian & Co., a corporation, obtained a judgment in the district court of Steele county, N. D., against Bartholomew Pickert upon a part of the indebtedness contracted, as before stated, in 1892, and by a decree entered in a creditors' suit commenced October 20, 1898, in the court below by Gotzian & Co. against the stock-raising company, Snow, Burt, and others (Burt v. Gotzian & Co., 43 C. C. A. 59, 102 Fed. 937), the Gotzian judgment was declared a lien upon all of these lands superior to any claim under the deed to the stock-raising company, the mortgages to Snow, or the sheriff's certificate and deed held by Burt. November 10, 1899, all of these lands were sold to C. Gotzian & Co. under this decree for the full amount of the judgment, $13,603.96, and a certificate of sale was issued to the purchaser by the master making the sale. In October, 1900, this certificate was sold and assigned to Lynch, who had become the owner of the Dwinnell certificates as before stated.

On November 9, 1900, the situation, briefly stated, was as follows: A mortgage lien held by one Davies, and amounting to about $19,000, had passed into a foreclosure decree, and was confessedly superior to all other claims. The claim under the sale made pursuant to the Gotzian decree was second in the order of superiority. Dwinnell, by his pending suit, was seeking to have the claim under the execution sales issued upon his judgments declared next in order. The time within which to redeem from the Gotzian sale and the Dwinnell sales would expire the next day, November 10, 1900. The Pickerts and Burt were without the means to meet this situation. Acting under the advice and with the assistance of Rozel F. Pickert, Burt, on November 9, 1900, entered into a written agreement with William H. Phipps, who was acting for himself, Frederick Weyerhauser, and John A. Humbird, wherein Burt agreed to convey to Phipps all the title which she then had or might thereafter acquire to all of these lands, excepting one section, and Phipps obligated himself to discharge the Davies mortgage lien for Burt, to redeem on her behalf from the Gotzian sale, and to put into the hands of her solicitors in the Dwinnell suit the amount required to redeem from the Dwinnell sales, "if the said sales were regular and valid, and the said two judgments so recovered by said Dwinnell were in fact charges upon said property." This agreement also provided that Phipps should sell and dispose of all the lands save the excepted section, and after reimbursing himself for the moneys advanced and paid under the agreement, and after deducting certain expenses and commissions, should pay to Burt one-fourth of the net proceeds, retaining the other three-fourths to himself. There was the further stipulation that if it should be found that Burt was not entitled to discharge the Davies mortgage lien or to redeem from any of said execution sales, or if for any reason the money advanced or tendered for that purpose should not be accepted, or should be returned after acceptance, then Phipps, and not Burt, should be entitled thereto. Under this agreement Phipps, on November 10, 1900, effected a redemption from the Gotzian sale by paying to the master $17,168.33, the amount requisite for that purpose, and the Davies mortgage lien was

adjusted by procuring an assignment thereof to Mr. Weyerhauser. Burt executed a conveyance to Phipps as agreed upon. Phipps, on November 10, 1900, advanced $7,787.84, the amount necessary to effect a redemption from the two Dwinnell execution sales, but no attempt was made within the prescribed year to pay or tender to the holder of the sheriff's certificates issued upon those sales or to pay or tender to the sheriff that amount or any other amount by way of redemption from those sales or either of them. In two successive answers to Dwinnell's bill to quiet title, filed by Burt February 10, 1900, and June 30, 1900, she asserted that her purchase of the sheriff's certificate issued upon the Allen, Moon & Co. sale was made in good faith, on her own account, and with her own funds. In a supplemental answer and in a cross-bill, both filed November 10, 1900, she reiterated this declaration of the good faith of her purchase of said certificate, and the consequent absence of any right or title under the execution sales upon the subsequent Dwinnell judgments, and then offered to pay into the registry of the court below the sum of $7,787.84, the amount required to redeem from the two Dwinnell sales, "if the said sales were regular and valid and the said two judgments so recovered by said Dwinnell were in fact charges upon said property." After declaring that Dwinnell would apply for and obtain sheriff's deeds upon the expiration of the period for redemption, and that such deeds would becloud Burt's title, this answer and cross-bill prayed "that the said moneys hereby offered to be paid into the registry of the court may be directed to be received and held therein subject to the further orders of this court, and payable thereunder to the person or persons rightfully entitled thereto, and that said sum may be held to abide the final decree of this court herein." The cross-bill also prayed that Dwinnell be restrained from applying for or receiving sheriff's deeds during the pendency of the suit. Upon the filing of this answer and cross-bill the court entered an order permitting the payment of said sum into the registry of the court to be held therein to abide the final decree, "but without prejudice in any way to the rights of" Dwinnell, and also granted an order temporarily restraining Dwinnell from applying for or receiving sheriff's deeds. March 1, 1901, after Lynch was substituted in place of Dwinnell as complainant, Burt filed a new answer and cross-bill, again asserting the good faith of her purchase of the certificate issued upon the Allen, Moon & Co sale, and the consequent absence of any right or title under the execution sales upon the subsequent Dwinnell judgments, and repeating her prayer that the $7,787.84 paid into the registry of the court be held therein to be applied in redemption from the Dwinnell sales in the event that Lynch's bill to quiet title should be sustained. This last answer and the accompanying cross-bill set forth for the first time that the two notes upon which the Dwinnell judgments were obtained represented but a single indebtedness, and that the first note was retained by the bank only as collateral security for the payment of the other, but no offer was made therein to presently redeem from the sale made under the execution issued upon the judgment obtained upon the second note which was the principal obligation, and represented the true amount of the indebtedness. Allegations of other infirmities in the title obtained through the sales upon the Dwinnell judgments

were also set forth in this answer and cross-bill for the first time. Both the answer and cross-bill set forth the agreement entered into with Phipps pending the suit, together with what had been done under that agreement, as hereinbefore recited. The prayer of this last cross-bill was that "the said pretended executions, and each of them, in favor of said William S. Dwinnell, be adjudged to be unlawful, unauthorized, and void, together with the pretended sales made thereunder, and each of them, and that * * * Frank Lynch * * * be adjudged to be a trustee for the exclusive use and benefit of the said Flora J. Burt of whatever right, title, and interest * * * [Lynch] at any time obtained by virtue of said pretended execution sales, or either of them, or of said pretended sheriff's certificates issued thereon; and that in case the * * * bill of said * * * [Lynch] shall upon final hearing thereof be sustained in whole or in part, then that an account be taken of the amount, if any, which was actually due to the said William S. Dwinnell upon said two promissory notes, or either of them, when his said actions thereon were commenced; * * * and that the said * * * Frank Lynch * * * be adjudged to execute, acknowledge, and file in said court for the said Flora J. Burt a good and sufficient conveyance of all said real property unto the said Flora J. Burt, her heirs and assigns, upon being paid out of said moneys deposited in court * * * the amount so found and adjudged to be due to the said * * * Frank Lynch; * * * and that the said sheriff's certificates upon said pretended execution sales * * * be * * * set aside."

After the final hearing, but before the decree was prepared or entered, the court made an order upon the application of Phipps that he be made a party "to the end that he may be protected in that portion of the decree which is made for his benefit, but for no other purpose." The final decree, entered August 15, 1902, declared that as to the complainant Lynch the assignment to Burt of the sheriff's certificate issued upon the Allen, Moon & Co. sale and the issuance to her of a sheriff's deed thereon were fraudulent and void, and quieted the title of Lynch to the lands in controversy against Burt, upon condition that Lynch should within 60 days pay to Phipps the principal sum of $17,168.33 expended by the latter in redemption of the lands from the Gotzian sale, with interest from the date of the decree; and that, if said payment should not be made within the allotted 60 days, Lynch should relinquish to Phipps all interest in these lands obtained through the Dwinnell sales upon condition that Phipps should within the next 30 days pay to Lynch the amount of the judgment upon the second or principal note, with interest and costs, together with such sums as Lynch shall have paid for taxes since the redemption from the Gotzian sale. The $17,168.33, with interest, was declared to be a lien upon the lands prior and paramount to the title of Lynch. The $7,787.84 was ordered to be returned to Phipps, and both Lynch and Phipps were authorized to apply to the court for any further orders necessary to insure the performance of the conditions imposed.

The contentions upon the joint and several appeal of Burt and Phipps will be first considered. The statutes of North Dakota (Rev. Codes 1899, §§ 5479, 5487, 5488), require the clerk to keep among the records

of the court a book for the entry of judgments, to be known as the "Judgment Book," in which the judgment in each case is to be entered by the clerk upon an order of the court or the judge. In the court in which Dwinnell's judgments were rendered the practice was for the clerk, as each order for judgment was made, to promptly write out the judgment with a typewriter upon separate sheets of paper of uniform size, to sign the judgment, to affix the seal of the court, to number the sheets consecutively according to the chronological order in which the judgments were so written out, and to place and securely keep these sheets in their proper order in a compact parcel in an inclosed box or case, in the form of a book labeled "Judgment Book," until there should be sufficient of them to make a bound volume, when the same sheets, in the same order, and with the same paging, were, under the clerk's direction, permanently stitched and bound together by a bookbinder. This course was pursued with the Dwinnell judgments, and, because the volume of which they are now a part was not permanently stitched and bound until after the execution sales thereon, it is urged that the sales were void for want of judgments to support them; in other words, that the judgments were not entered until they were put into a permanently stitched and bound volume. The practice of entering judgments in this manner must have had the approval of the court, and probably of the bar, or it would not have been followed. What was done accomplished the purpose of the statute for the time being, and, even if it does not deserve commendation, we think the sheets upon which the judgments were so recorded, and which were arranged and held together in the order and in the manner described, constituted a judgment book, and that the judgments in question were entered within the meaning of the statute when they were placed in that book in conformity to the existing practice.

It is claimed that the prior sale under the Gotzian decree, which was a superior lien, left nothing in the judgment debtor which could be sold on the Dwinnell executions, and therefore that no right or title passed to the purchaser at the Dwinnell sales. But under the statutes of North Dakota (Rev. Codes 1899, §§ 5541, 5544, 5548), the judgment debtor has one year within which to redeem from an execution sale, and during that year is entitled to the possession and retains the legal title. These statutes determined the rights of the parties under the Gotzian sale. There was, therefore, in the judgment debtor during the ensuing year a substantial interest in the property, and this, by the law of North Dakota (Rev. Codes 1899, § 5507), as well as by the rule prevailing elsewhere, was subject to sale on execution. Freeman on Executions (2d Ed.) § 182.

A principal contention is that at the time of the execution sales upon the Dwinnell judgments the state of the title and the ownership of the lands were such that they were not subject to sale on execution at law against Bartholomew Pickert, and could be subjected to the satisfaction of those judgments only through a creditors' bill in equity. This contention proceeds from what we deem to be an erroneous theory that, if Burt's title is fraudulent, it is because it was acquired at the instigation and for the secret benefit of Rozel F. Pickert. What would be the effect if this theory were sustained by the pleadings and evidence

need not be considered, because, as heretofore indicated, we are convinced that, while Rozel F. Pickert instigated and controlled the action of Burt in the acquisition of this title, he did so as the representative and on behalf of Bartholomew Pickert, and for the purpose of defeating the latter's creditors. There is here no question whether a judgment debtor's purely equitable interests in lands or his interests therein which are concealed, otherwise than through his fraudulent conveyance to another, are subject to levy and sale on execution at law against him under the laws of North Dakota. The legislation of that state respecting fraudulent conveyances is modeled after 13 Elizabeth, c. 5, and as set forth in the Rev. Codes of 1899 reads as follows:

"5052. Transfers with intent to defraud creditors void.—Every transfer of property or charge thereon made, every obligation incurred and every judicial proceeding taken with intent to delay or defraud any creditor or other person of his demands is void against all creditors of the debtor and their successors in interest and against any persons upon whom the estate of the debtor devolves in trust for the benefit of others than the debtor."

"5080. He who has fraudulently dispossessed himself of a thing may be treated as if he still had possession."

The effect of this legislation is that, as to creditors, the title and ownership of the property transferred with intent to delay or defraud creditors remains in the grantor, and is subject to levy and sale on execution at law against him, as fully as though no transfer had been attempted. This much is fully conceded by counsel. But the legislation does not stop there. It operates not only upon conveyances directly from the debtor, made with such fraudulent intent, but also upon transfers whereby his title and ownership are passed to another for the like dishonest purpose through the agency of a judicial sale. In Bump on Fraudulent Conveyances (4th Ed.) § 236, the law upon this question is well stated as follows:

"A public sale may be void although it is made in satisfaction of a real debt, and the creditor is innocent of the guilty scheme, and ignorant that he is made subservient to its execution. The advantage obtained by an honest creditor cannot protect the intent with which other parties act from investigation, or confirm those parts of the transaction by which they would acquire or reserve valuable interests, nor can his innocence purge their bad faith. If the debtor, for instance, at a public sale under a mortgage or an execution advances the money with which another purchases the property, there is, as against creditors, no sale. The transaction, it is true, assumes the form of a public sale, but this is a fiction. The form is merely apparent, not real. There is in such a case no distinction between a conveyance directly from the debtor and one from the sheriff or other public officer. In reality the conveyance is from the debtor through the sheriff or other public officer. It gives to the dealing the semblance of fairness, but nothing more than the semblance. It does not make it fair, though it increases the difficulty of detecting its unfairness; but, when detected, that avoids this as well as other transfers, however solemn. It is substantially as much a sale inter partes as if there were no intervention of the sheriff or other public officer."

See, also, Decker v. Decker, 108 N. Y. 128, 135, 15 N. E. 307; Burt v. Gotzian, 43 C. C. A. 59, 68, 102 Fed. 937; Watson v. Bonfils, 53 C. C. A. 535, 543, 116 Fed. 157.

As to creditors Bartholomew Pickert held the title and ownership notwithstanding his fraudulent conveyance to the stock-raising com-

pany. The Allen, Moon & Co. judgment against him was lawfully rendered, and the execution sale thereunder was lawfully made; but, instead of redeeming from that sale, he, by the use of the very money with which he could and should have effected a redemption, purchased the sheriff's certificate in the name of another, and procured a sheriff's deed thereon, in an attempt to pass his title to another for the purpose of concealing his property and defeating his creditors. This was a fraudulent transfer within the terms and meaning of the North Dakota statute, and, as against creditors, left the title and ownership in the debtor, subject to levy and sale on an execution at law against him in like manner as though he had paid the Allen, Moon & Co. debt and prevented the issuance of the sheriff's deed.

As before stated, the two notes of Bartholomew Pickert, one bearing the indorsement of Rozel F. Pickert, which were purchased from the receiver of the bank of New England by Dwinnell, and upon each of which he recovered a judgment against Bartholomew Pickert, represented but one debt; the older note being held as collateral security to the other. Counsel concede that Dwinnell was entitled to sue upon both notes and to obtain judgment upon each, but insist that he was entitled to have his debt satisfied only once and that any use of the collateral judgment beyond this was void. That this point is well taken is not open to serious question. So long as the principal obligation or debt was unsatisfied, it was no defense to an action upon the older note that it was held only as collateral security, and not as representing a separate and independent indebtedness. Colebrooke on Collateral Securities (2d Ed.) § 113; 2 Black on Judgments, § 746; Royal Bank v. Grand Junction R. R. Co., 100 Mass. 444, 97 Am. Dec. 115; Miller's River Bank v. Jefferson, 138 Mass. 111; Vanuxem v. Burr, 151 Mass. 386, 24 N. E. 773, 21 Am. St. Rep. 458; Burnheimer v. Hart, 27 Iowa, 19, 99 Am. Dec. 641, 1 Am. Rep. 209. Nor were the judgments against Bartholomew Pickert, rendered long after the transfer to Burt, conclusive against her as to the existence or amount of the debt at the time of the transfer. She was a stranger to the judgments, and could not be prejudiced by them in respect of any pre-existing right. Mattingly v. Nye, 8 Wall. 370, 373, 375, 19 L. Ed. 380; Dull v. Blackman, 169 U. S. 243, 248, 18 Sup. Ct. 333, 42 L. Ed. 733; Bruggerman v. Hoerr, 7 Minn. 337 (Gil. 264), 82 Am. Dec. 97; Gottlieb v. Thatcher (C. C.) 34 Fed. 435, 438, by Judge (now Mr. Justice) Brewer; Freeman on Judgments (4th Ed.) §§ 162, 235. The rendition of judgment upon the old note did not alter or extinguish its character as collateral security. The judgment was as much collateral as had been the note before the judgment was rendered, and when the principal obligation or debt was satisfied the only purpose for which the collateral was held or could be used was accomplished. The satisfaction of the judgment upon the principal note was a satisfaction of the judgment upon the collateral note. The lands were sold under an execution upon each judgment. The two sales were made at the same time, and the lands were bid in at each sale by Dwinnell, the execution creditor, for the full amount of the judgment and costs. Because of the small payment made upon the new or principal note, as before mentioned, the judgment thereon was for a few dollars less than the judgment upon the

other note. In these circumstances the sale upon the principal judgment satisfied the debt, and the sale upon the judgment held as collateral was void, and conferred no right upon the purchaser. The purpose of an execution sale is the satisfaction of the judgment creditor's claim, and when that is accomplished the right to sell on execution is at an end. An execution sale made notwithstanding the satisfaction of the judgment upon which the execution is issued is wholly unauthorized. Freeman on Executions (2d Ed.) § 19.

While the transfer to Burt was fraudulent and void as against creditors, it was effective against Bartholomew Pickert, the judgment debtor, and made Burt his successor in interest within the meaning of the statute of North Dakota (Rev. Codes 1899, § 5540), prescribing who may redeem from execution sales. It is complained that the decree, instead of dismissing her cross-bills, should have permitted her to redeem from the valid Dwinnell sale. In the absence of statutory provision therefor, there is no right of redemption from execution sales, and it logically follows that the extent or measure of the right is found in the statutory terms prescribing the time and method of its exercise and designating the persons who may exercise it. Keely v. Sanders, 99 U. S. 441, 446, 25 L. Ed. 327. In considering the character and extent of this right under the statutes of North Dakota, the Supreme Court of that state said, in State v. O'Connor, 6 N. D. 285, 291, 69 N. W. 692, 693:

"We have assumed that a redemption must be made within the period provided by the statute, in the absence of peculiar circumstances calling for a relaxation of this strict rule. On this point it is only necessary to state that, as the right is created by statute, the beneficiary of such legislation must take the privilege burdened with all its restrictions. * * * The Legislature has full control over the subject of redemption from execution and mortgage sales. It may declare that all rights shall be divested by the sale, or it may accord to the parties interested in the property any indulgence which appears to it to be wise. The right to redeem after sale is a matter of favor, and the law-making power may prescribe the terms on which such privilege shall be enjoyed. It may declare that in a certain contingency the redemption must be made within a particular period of time, and that in a certain other contingency it must be effected within another prescribed period. This is precisely what our statute has done. Nor have we any right to overthrow the express provisions of the redemption law because to us it may seem to be an impolitic enactment. If any redemptioner suffers loss, it is because of inattention to his own affairs."

In denying a claim to redeem after the expiration of the prescribed time, where the debtor was prevented from redeeming during that time by an unavoidable and distressing illness which incapacitated him from considering or attending to business affairs, Mr. Justice Campbell said, in Cameron v. Adams, 31 Mich. 426:

"Courts of equity have large powers for relief against the consequences of inevitable accident in private dealings, and may doubtless control their own process and decrees to that end. But we think there is no such power to relieve against statutory forfeitures. Where a valid legislative act has determined the conditions on which rights shall vest or be forfeited, and there has been no fraud in conducting the legal measures, no court can interpose conditions or qualifications in violation of the statute. The parties have a right to stand upon the terms of the law. This principle has not been open to controversy, and is familiar and elementary."

These cases but state the general rule, which rests upon the want of power in courts of equity to enlarge or extend a right which they were powerless to create, their duty to yield obedience to the direct expression of the legislative will, and the manifest justice in requiring a debtor, who, as matter of grace, is granted the statutory period within which to save his land, to exercise the right within the time and in the manner prescribed. Time is of the essence of the conditions upon which the right is granted.

While substantially acceding to the statement of the general rule just made, counsel urge that a redemption was effected by the payment of the requisite amount into the court below under the circumstances heretofore recited, and also that this case comes within the general authority of courts of equity to relieve against fraud. We have no doubt that a statutory right of redemption may be enforced through a bill in equity, seasonably brought, in instances where the exercise of the right in conformity with the statutory requirements is wrongfully denied, obstructed, or prevented, or where, before the right can be properly exercised, it is necessary to determine by judicial proceedings in whom the right rests, from whom the redemption must be made, or the amount requisite to effect it; but a careful consideration of the facts of the present case demonstrates that it is not one for equitable intervention. In North Dakota the period within which redemption may be made by the judgment debtor or his successor in interest is one year after the sale. The redemption is to be effected by paying to the purchaser or to the officer who made the sale the amount of the purchase price and the amount of any taxes paid by the purchaser after the sale, with interest upon both amounts, and in default of a redemption according to law the sheriff is required to immediately execute a deed to the purchaser or his assignee. Rev. Codes 1899, §§ 5541, 5544, 5546. The sales upon the Dwinnell executions were made November 10, 1899, and the period of redemption expired November 10, 1900. During that time no payment or offer of payment was made to the purchaser or to the sheriff by way of redemption from either of these sales. No obstacle of any sort was interposed to a redemption from either sale. The right to redeem was clear, and was expressly conceded to rest in Burt. It was well known that redemption could be made by payment to the sheriff. The amount requisite to make redemption from either sale was readily ascertainable. The only fraud charged, or element of uncertainty claimed, is that the sale of the lands under an execution upon each of the judgments, under a claim of right so to do, made the amount requisite to completely discharge the lands from Dwinnell's claim appear to be more than twice as large as it was in fact. Ordinarily, a wrongful sale of the same lands upon each of two judgments, and for the full amount of each, when the creditor is entitled to the satisfaction of but one of them, would embarrass or burden the exercise of the right of redemption, and work a fraud upon the person entitled to redeem; but the facts of the present case make it quite clear that Burt's failure to redeem according to the statute and within the prescribed period was not at all due to the unauthorized and void sale upon the collateral judgment, and that it did not work a fraud upon her. Neither Dwinnell nor Lynch was guilty of any wrongful intent

or purpose. Each acted in the belief that each note represented a separate indebtedness, and in the light of circumstances tending to justify that belief. Upon the other hand, Bartholomew Pickert and Rozel F. Pickert at all times knew there was but a single indebtedness, and that the older note was held only as collateral security to the other. Burt was acting at the instance of Rozel F. Pickert and on behalf of Bartholomew Pickert, and was chargeable with their knowledge. She also had personal knowledge of the existence of the two judgments, of the intended execution sale upon each judgment, and of the sales after they were made. Before entering into the negotiations with Phipps she knew that the two notes upon which the judgments were rendered represented a single indebtedness in the amount of only one of them, and during those negotiations a direct and positive statement of this fact was made to her and her counsel by Rozel F. Pickert, who had conducted the negotiations with the Bank of New England and executed the two notes on behalf of Bartholomew Pickert. Notwithstanding all this, no attempt or effort was made to redeem under the statute by the payment or tender of the amount actually due. Redemption was not what Burt and the Pickerts were striving for, or at most it was only remotely and contingently contemplated. Their chief purpose was to falsely maintain that Burt's title was acquired in good faith, and for her own benefit, and that in consequence no right was obtained through either sale upon the Dwinnell executions. It was necessary to do this to discourage and prevent other creditors from assailing Burt's title, which was part of the fraudulent scheme. It was not until the filing of Burt's last answer and her amended cross-bill, almost four months after the expiration of the period for redemption, that there was any claim of irregularity or invalidity in either of the Dwinnell sales, other than that the lands sold thereat were the property of Burt, and not subject to levy or sale on execution against Bartholomew Pickert.

On the last day of the year for redemption, at the time of filing her first cross-bill, Burt paid into the registry of the court below the full amount apparently necessary to redeem from both sales, but this was done as a basis for securing an order restraining Dwinnell from applying for or receiving a sheriff's deed upon either sale pending the suit, and was not because Burt was not in possession of the real facts respecting the amount of the debt. Nor was this payment or deposit made with any purpose to then effect a redemption from both sales, or either of them. It was accompanied by a prayer that the money be held in the court's registry to abide the final decree, and was permitted by the court with the added restriction that it should be without prejudice in any way to the rights of Dwinnell. This was not the equivalent of payment under the statute, or of a tender thereof. It did not leave Dwinnell or Lynch free to accept or receive out of the money deposited the amount due under the principal judgment, and to retire from the litigation as having no further interest in its subject-matter. The primary purpose of the cross-bills was not to enforce or make it possible to exercise a statutory right of redemption, but to entirely avoid both Dwinnell sales upon grounds which we think were obviously without merit, and could not have been presented with any reasonable

hope of success. Redemption was the remote purpose of the cross-bills, and was contemplated only in the contingency that Burt should fail in all else. The course pursued was vexatious, and devoid of honest purpose. Burt elected to continue the effort to fraudulently defeat a debt which she knew to be honest, rather than to redeem within the statutory period from a valid execution sale thereon. She failed in this, and equity will not relieve her from the result. Keith v. Losier, 88 Iowa, 649, 658, 55 N. W. 952.

Lynch complains of the decree because the relief granted is upon condition that he repay to Phipps the amount expended by the latter in redeeming the lands from the Gotzian sale, because, if that condition be not performed, he is required to relinquish to Phipps the section of land which was subject to the Gotzian lien, but was not included in the transaction between Burt and Phipps, and because Phipps is not required to pay Lynch's taxable costs and disbursements. That he who seeks equity must do equity is a controlling principle or maxim of universal application in awarding equitable remedies. Following it, adverse equities growing out of or closely connected with the subject-matter of the suit are protected by giving to a party the relief to which he is entitled only on condition that he accords to his adversary the corresponding right to which he also is entitled. This principle has a recognized application in suits by creditors to avoid or quiet title against fraudulent conveyances or transfers of a debtor's property, where, after the conveyance or transfer, taxes are paid or incumbrances discharged under circumstances which give rise to an equity equal or superior to that of creditors. If the grantee has been a conscious participant in the fraud, he is not, as against creditors, entitled to reimbursement for such expenditures. Burt v. Gotzian & Co., 43 C. C. A. 59, 69, 102 Fed. 937; Guckenheimer v. Angevine, 81 N. Y. 394. Public policy forbids the reimbursement of a particeps criminis; otherwise one would hazard nothing by active participation in such unfair dealing. But if the grantee has not been a conscious participant in the fraud, he is entitled to reimbursement, to be provided for in the decree. Clements v. Moore, 6 Wall. 299, 312, 18 L. Ed. 786; Voorheis v. Blanton, 32 C. C. A. 384, 89 Fed. 885; Boyd v. Dunlap, 1 Johns. Ch. 478; Milholland v. Tiffany, 64 Md. 455, 2 Atl. 831; Daisy Roller Mills v. Ward, 6 N. D. 317, 324, 70 N. W. 271. This distinction is not confined to the grantee himself, but is equally applicable to those who claim through him. The facts as clearly give Phipps an equitable claim or right to reimbursement as they exclude Burt therefrom. She was an active and conscious participant in the fraud, while he was an entire stranger to it for more than three years after it was committed, and was at no time a conscious participant therein. He was constructively chargeable with knowledge of it, because he entered into the written agreement with Burt, and acquired her title pending the present suit, and subsequent to the Gotzian decree. He also advanced the money to pay Burt's counsel and other expenses in this suit, and was therefore constructively chargeable with her vexatious and wrongful effort to sustain the fraudulent transfer and to defeat the complainant's claim. The evidence, however, clearly establishes that in all this Phipps was acting in perfect good faith, without intent to defraud any one,

in a mistaken belief in the honesty of Burt's claim and conduct, and under the approving advice of reputable counsel. The Gotzian claim was a lien upon all of the lands paramount to any interest under the Dwinnell execution sales. In pursuance of the agreement with Burt into which he had entered in good faith, and acting upon an honest belief ·that he had thereby acquired a right and incurred an obligation so to do, Phipps discharged and removed this paramount lien by paying $17,168.33 in redemption from the sale thereunder. Under the rules stated, he was entitled as against complainant to reimbursement for that expenditure, and to have its repayment made a condition to the relief granted to complainant, and declared a lien upon the lands as the Gotzian claim had been. He was also entitled to interest upon this sum from the date of the redemption, and not merely from the date of the decree, because the right to interest was as much a part of the claim paid as was the right to the principal, and the payment of both was secured by the same paramount lien.

The transaction between Burt and Phipps gave him no interest in one section of the land, but that section was included in the Gotzian sale and in the Dwinnell sales. The decree provides that, if the complainant fails to reimburse Phipps for redeeming from the Gotzian sale, and if Phipps pays to the complainant the full amount of the principal Dwinnell judgment, with interest, costs, and taxes, the complainant shall relinquish to Phipps all the lands, including this section. We perceive no error in this. In the event contemplated Phipps would be justly entitled to all, and the complainant to none, of the rights and benefits which passed by the Gotzian and Dwinnell sales.

While Phipps was not made a party to the suit until after the final hearing, we think he was constructively responsible for what was done by Burt after the date of the written agreement with her, under which his interest in the title which she was asserting and defending became the controlling one. The litigation was continued in her name with his approval, and largely for his benefit. She was evidently without means. Phipps, as well as Burt, should have been charged with the payment of the costs incurred in the court below after the date of the agreement.

The decree is modified by requiring the interest upon the reimbursement conditionally required to be made by complainant to be computed from the date of the redemption from the Gotzian sale instead of from the date of the decree, by taxing the costs incurred after November 9, 1900, against Burt and Phipps jointly, by crediting upon the reimbursement so conditionally required the amount of complainant's costs incurred after that date, and by fixing 60 days from the date when the costs shall have been taxed as the time within which such reimbursement shall be made, and, as so modified, the decree is affirmed. The costs in this court will be taxed two-thirds against Burt and Phipps jointly, and one-third against Lynch.