[No. 3909.]

## TIBBETTS V. TERRILL ET ALS.

1. APPEAL AND ERROR—*Law of the Case.* The judgment of the Supreme Court is, both as to matter of fact, and matter of law, conclusive upon a subsequent writ of error, in the same cause, removed to this court. (68)

2. FRAUDULENT CONVEYANCES—*Improvements Made by Purchaser with notice,* of the fraud, and without necessity, are made at his peril. (69, 70)

3. —— *Mortgage by Fraudulent Grantee—Subrogation.* As a general rule where a purchaser's title fails, he will be subrogated to the right of the holders of prior encumbrances which he has paid, or which have been discharged out of the purchase money.

But a fraudulent grantee who knowingly participated in the fraud has no standing in the court of equity, and will not be subrogated, or in any way protected as to moneys paid by him to discharge liens existing at the date of the fraudulent purchase. (70, 71)

Terrill purchased lands of Dickenson. Part of the purchase price was represented by a mortgage to Dickenson. Terrill afterwards conveyed the lands to his wife, without consideration, and for the sole purpose of defeating the just claim of a creditor. Alley subsequently purchased the lands from the wife of Terrill, with constructive notice of the fraudulent character of her title, but without actual notice of the fraud, and acting in entire innocence. His title being vacated on bill brought by the creditor, he was allowed moneys paid by him to discharge the mortgage to Dickenson. (71, 72)

But he was denied any allowance for moneys paid to discharge a mortgage executed by Terrill's wife, after a judgment recovered by the creditor had become a lien upon the land.

4. NOTICE—*Facts Putting Upon Inquiry.* One who purchases' lands with notice of facts which put him upon inquiry as to the title of his grantor is chargeable with notice only of those facts which diligent inquiry on his part would have developed.

The conveyance to his grantor having been made in fraud of creditors, it is not to be assumed that those participating in the fraud would have confessed their turpitude. (72)

5. PRECEDENTS—*Effect.* The general language of a judicial opinion is to be read in connection of the facts of the particular case. (73)

*Error to Rio Blanco District Court.* HON. JOHN T. SHUMATE, Judge.

MESSRS. ROGERS, ELLIS & JOHNSON, and MR. PIERPONT FULLER for plaintiff in error.

MR. JAMES C. GENTRY for defendant in error, Alley.

HURLBUT, J., rendered the opinion of the Court.

The original complaint in this action was filed August 8, 1902, by plaintiff in error (plaintiff below), and the action was brought to enforce the collection of a judgment for $6,378, rendered January 5, 1901, in favor of plaintiff Tibbetts, against David P. Terrill. The judgment was recovered in Arapahoe County, in the Second Judicial District, and transcript thereof filed for record with the clerk and recorder of Rio Blanco County, on the 18th day of January, 1901. Plaintiff caused execution thereon to be issued and sent to the sheriff of Rio Blanco County, who levied upon the property in issue on April 29, 1901. After the levy, Louise C. Terrill brought an action against Tibbetts *et al.,* in the District Court of Rio Blanco County (June 18, 1901), and succeeded in securing a restraining order out of that court against the sheriff of Rio Blanco County, therein recalling the said execution, vacating the levy, and prohibiting the sheriff from further proceeding to advertise and sell the property under the execution. Apparently that suit was never prosecuted to a final hearing. On September 9, 1901, and while the injunction suit was pending, plaintiff Tibbetts caused a *lis pendens* to be filed with the clerk and recorder of said Rio Blanco County, it being therein stated that on November 22, 1900, defendant David P. Terrill, then being the record owner of the premises, conveyed the same to John L. Gray, his attorney; that on December 30, 1900, said Gray deeded the premises to defendant Louise C. Terrill, wife of said David P. Terrill; that on October 3, 1901, the said Louise C. Terrill, with full knowledge and notice of the filing of said transcript of judgment, and *lis pendens,* as aforesaid, deeded said property to defendant J. A. Alley; that said *lis pendens* gave notice that plaintiff would urge and contend that the transfers and conveyances made by said David P. Terrill, John L. Gray and Louise C. Terrill, as aforesaid, were without considera-

tion, fraudulent, and void as against plaintiff Tibbetts. After said restraining order had been issued, and after the conveyance of the property hereinbefore mentioned, the present action was begun. It seeks to secure a decree of the court canceling all said conveyances, subjecting the property to plaintiff's lien, and ordering the property sold to satisfy the judgment of $6,378.

This is the second time this case appears in our appellate courts. At the first trial judgment was rendered for defendants Alley *et al.,* from which plaintiff prosecuted an appeal to the Supreme Court, which court, in April, 1908, reversed the judgment and remanded the case. *Tibbetts v. Terrill,* 44 Colo. 94, 96 Pac. 978, 104 Pac. 605. It was tried again in the District Court without a jury, and judgment was again rendered for defendant Alley, from which this appeal is taken. In the second trial all the evidence which had been introduced at the first trial was admitted, followed by other evidence upon an issue which had been formed by an amendment to defendants' original answer, the issues thus tendered pertaining to improvements made on the property after Alley's purchase, and to a mortgage existing thereon at the time Tibbetts fastened his judgment lien on the property. The amendment was apparently filed because of the language used by the Supreme Court in the latter part of its opinion in the case cited.

The statement of the facts of this case by Justice Bailey in *Tibbetts v. Terrill, supra,* renders it unnecessary for us to restate them in full. In that case the Supreme Court substantially held that, although defendant Alley paid to Mrs. Terrill full value for the property, he was not a purchaser in good faith without notice; that the deeds between the Terrills and Gray were fraudulent and void as against the judgment creditor Tibbetts; that Alley made the purchase with knowledge and information, by himself and his attorney, of the recorded *lis pendens* and levy, and other facts and circumstances sufficient to put him on inquiry as to the fraudulent character of the deeds between defendants David and Louise

Terrill and Gray; that such facts and circumstances were sufficient to put Alley on his guard, and imposed upon him the duty of further investigating the charge of Tibbetts that such deeds were fraudulent as to him; further holding that the title of defendant Alley, acquired by him through the deed of Louise C. Terrill, was subject to the payment of plaintiff's judgment of $6,378, less $2,000 which Alley was entitled to as a prior claim, through and by virtue of the homestead filed by Louise C. Terrill, September 5, 1901. After that opinion had been rendered, appellant Tibbetts filed in the Supreme Court a motion asking that court to direct the entry of judgment in the lower court in accordance with its opinion. Appellee Terrill also filed a motion asking that the amount of the two mortgages which were standing against the premises when defendant Alley purchased the same from Louise C. Terrill, and which Alley had paid off and cancelled after his purchase, be declared to be a superior lien to that of appellant Tibbetts. The Supreme Court denied both motions in the following language:

"There is nothing in the pleadings concerning these incumbrances, neither is there anything in the original briefs filed in this court relating to them. It appears by the abstract that the consideration paid by the appellee was in part the payment of certain incumbrances, but no issue was made of that matter in the trial court, and we cannot, upon motion, after the rendition of an opinion, determine the merits of a controversy which was not involved in, nor passed upon by, the trial court."

The amendment to the answer above alluded to set up, substantially, that the mortgages were in favor of one C. J. Dickinson, mortgagee, and that the $4,000 represented thereby was a part of the original purchase price in the sale from Dickinson to David P. Terrill; that Alley had purchased the premises in good faith, and paid off the $4,000 represented by said mortgages, with interest, and had caused both to be released of record. The amended answer further alleged that

defendant Alley ·had placed improvements upon the premises, after his purchase from Louise C. Terrill, of the value of $1,700, which is· conceded.

· There are but two· propositions for consideration by the court on this appeal, viz : (1) Whether or not defendant in error Alley is entitled to an allowance for the improvements placed on the property after his· purchase from Mrs. Terrill, and ·entitled to· claim the same as a superior lien to that of Tibbetts' judgment; (2) whether or not Alley should be subrogated to the rights of the ·mortgagee Dickinson, by reason of having assumed the mortgage of $3,000 at the time of his purchase, and which· mortgage he subsequently paid, and whether or not he is entitled to like subrogation after paying off the $1,000 mortgage.

We may say at this time that the questions (1)· as to whether or not defendant in error Alley was an innocent purchaser for value without notice, from Mrs. Terrill, (2)· as to whether or not he ·had sufficient knowledge of the facts and circumstances surrounding the giving and receiving of the fraudulent conveyances aforesaid to put him upon inquiry and· cause him to investigate further the validity thereof, as against Tibbetts' judgment lien, (3) as to whether or not said conveyances were without consideration, fraudulent, and given to· hinder and ·delay the creditor Tibbetts from collecting his · said judgment, and (4) as to whether or not Alley is deemed in law to have possessed constructive knowledge of the fraudulent character of ·said conveyances and want of title in his grantor, Mrs. Terrill, to convey the premises to· him free from Tibbetts' lien—have all been decided and disposed of by the Supreme Court in the case cited, against the claims and contentions of. Alley. The rulings of the Supreme Court upon these questions are binding upon us under the doctrine of the "Law of the Case," which is invoked by plaintiff in error.

It may be well to notice here that although the answer as amended alleges that the property was incumbered to Dickinson for $4,000 at the time Alley purchased from Mrs. Ter-

rill, and the same was part of the original purchase price
from Dickinson to David Terrill, the record seems to show
that only $3,000 thereof was a part of such purchase price.
The abstract of title (in evidence) shows that the mortgage to
Dickinson from David Terrill for $3,000 was on record be-
fore Tibbetts' transcript of judgment was recorded, while the
other $1,000 was represented by a mortgage given for that
amount to Dickinson by Mrs. Terrill on April 10, 1901, re-
corded April 22, 1901, which was after the filing of Tibbetts'
transcript of judgment. It further appears from the record
that the written contract of sale between Mrs. Terrill and
Alley makes no mention of the last mentioned mortgage, so
that Alley did not assume or agree to pay the same. The
facts concerning the payment of this $1,000 mortgage by
Alley, as disclosed by the record, are as follows: When the
deed from Mrs. Terrill was delivered to Alley on October
28, 1901, he, at her request, paid to the bank, to the credit
of Dickinson, $1,000, which sum was deducted from that part
of the purchase price which Alley had agreed to pay Mrs.
Terrill that day. The $1,000 so paid to Dickinson was for
the sole purpose of discharging that mortgage.

Now, as to the question of improvements made by Alley
and his right to a lien therefor, it is well to call attention
to the circumstances under which such improvements were
made. As said by the Supreme Court, Alley bought the prem-
ises with knowledge and information of the fraud perpe-
trated upon Tibbetts by Mrs. Terrill and her grantors, or at
least with knowledge of facts and circumstances which in law
imposed upon him the duty, before buying the premises, of
investigating further the title of Mrs. Terrill. We think, as
regards these improvements, that Alley, having constructive
knowledge, as he did, of the fraudulent character of the con-
veyances from David Terrill and Gray, down to his imme-
diate grantor Mrs. Terrill, expended his money in improving
the property, well knowing that Tibbetts was vigorously fol-
lowing up his claim and contention that Mrs. Terrill's title

was fraudulently obtained, and was invalid as against his judgment lien. It was in no way imperative that Alley should have made such improvements. His failure to do so would in no way have jeopardized the title which he thought he had. Under such circumstances common prudence should have caused him to refrain from expending any money on the premises other than was absolutely necessary to prevent loss of the same, until after the claims of Tibbetts had been finally determined. This being the situation we are unable to agree with his contention that he should be reimbursed for the improvements placed on the premises after his purchase. He made such improvements at his own peril, so far as Tibbetts is concerned, and ought to suffer the consequences. As between himself and Mrs. Terrill, he had the legal title to the property, and had a right to do with it as he chose, but he assumed the risk of proving he was an innocent purchaser for value without notice. *Shand v. Hanley et al.*, 71 N. Y. 319; *Linthicum and wife v. Thomas*, 59 Md. 574. In *Strike v. McDonald* (2 Harris & Gill) 13 Md. 142, we find this language:

"The quoted passage of Sugd. 525, furnishes a sound practical rule for rejecting claims for improvements, where the transaction is tainted with fraud. It is expressed nearly in these words: If a man has acted fraudulently, and is conscious of a defect in his title, and with that conviction on his mind, expends a sum of money in improvements, he is not entitled to avail himself of it."

We are of the opinion that the District Court erred in allowing for the improvements made by Alley and decreeing the same to be a prior lien to that of Tibbetts' judgment.

We come now to the question of subrogation as applied to the mortgages paid by Alley after his purchase. We will first consider the mortgage of $1,000 given by Mrs. Terrill to Dickinson after Tibbetts' transcript of judgment had been recorded. The determination of this question should require but little space, as Alley's position concerning this payment

does not appear to us to warrant the interposition of a court of equity to save him from any loss he might have sustained through the release of that mortgage. The mortgage was recorded over three months after the recording of the transcript of judgment. Alley not only had constructive notice of the recorded transcript, but he had actual ·notice thereof at the time he paid off the mortgage. The lien created by the filing of the transcript of judgment was paramount ·to that of the mortgage, and was in no way affected by it; hence the court erred in decreeing this mortgage to be a prior lien to that of the judgment.

There is but one question remaining for determination, viz: the right of Alley to be subrogated to Dickinson, mortgagee, through payment and release of the $3,000 mortgage. The record shows that at the time Alley purchased the premises from Mrs. Terrill he assumed and agreed to pay that mortgage. It may be well to briefly recite Alley's position in connection with the payment of this mortgage. The pleadings nowhere charge Alley with fraud or with knowledge of the fraud practiced upon Tibbetts, through the execution of the fraudulent deeds' referred to, and do not charge him with participation therein. The complaint goes no further than to charge him with notice of the recorded *lis pendens* and its contents.

From the evidence and findings of the court it appears that Alley was a resident of the state of Missouri, had only been in Colorado, or in the vicinity of the premises, about a week before he made the purchase, and had never known David or Louise Terrill, or Gray, prior to that time; that he personally knew nothing about the fraud practiced against Tibbetts by the Terrills and Gray, in the execution and delivery of the said conveyances; that he never had any conversation with any of said parties, or with any one else, concerning the purpose or intent of any of them in the execution and delivery of the deeds; and that at the time the deeds were made he was not within the boundaries of the state, and those

people were entire strangers to him. From this it would appear that the only knowledge he had of the fraudulent purpose in giving and recording such deeds was such knowledge, necessarily constructive, as the law charged against him through notice of the recorded *lis pendens,* levy, and other documents. He might have examined the records thoroughly and made every effort to obtain therefrom information concerning the motives of the Terrills and Gray in giving the deeds, and still the limit of information so acquired would have been that Tibbetts *claimed* and *contended* that the fraudulent deeds were given solely for the purpose of fraudulently defeating him in the collection of his judgment out of the premises. It is more than probable that the question of intent or evil design on the part of the Terrills and Gray in giving the deeds would have remained a closed secret to Alley. He might have interrogated them concerning such intent and design, and would in all probability have failed to elicit any information from them on that subject. It is certainly a reasonable presumption that none of them would have taken him into their confidence, and divulged to him their fraudulent design and purpose in executing the deeds. We have already seen that the Supreme Court held this constructive knowledge possessed by Alley was sufficient to defeat his claim that he was an innocent purchaser for value without notice, thereby holding that he took no title to the premises as against the judgment lien, through the deed executed to him by Mrs. Terrill. Therefore any question as to Alley having any title to the premises as against Tibbetts, by virtue of Mrs. Terrill's deed to him, is closed. Alley is not here complaining on that score, and concedes he has been defeated on that issue; but he vigorously contends that while *Tibbetts v. Terrill, supra,* destroyed his title under the deed from Mrs. Terrill, so far as Tibbetts' judgment is concerned, it did not pass upon or determine his equitable rights emanating from his payment of the $3,000 mortgage. In this contention he is clearly right. The Supreme Court expressly refused to

consider this point. Nothing said in that case can be taken or considered as applicable to this question. In fact the Supreme Court in that case had under consideration but two questions, one pertaining to the homestead claim, and the other to Alley's title under his deed from Mrs. Terrill as against Tibbetts' judgment lien. We believe its reasoning and analysis of the evidence was intended to be applied only to the issue under consideration, viz: Was Alley an innocent purchaser without notice? The rule there was clearly defined, but went no further than to hold that a purchaser from a fraudulent grantee was not an innocent purchaser for value without notice, when the record disclosed that he had knowledge of facts and circumstances at the time of purchase which would put a prudent man upon inquiry, and which if followed up by investigation would have disclosed the fraudulent and defective title of his grantor.

"The rule is familiar that general language in an opinion is to be taken in connection with the facts of the particular case. * * * To make the matter entirely clear we call attention to the difference in the character of the action and the issues therein." *Halbouer v. Cuenin*, 45 Colo. 507, 101 Pac. 763.

There is reputable authority holding that a purchaser from a fraudulent grantee cannot be deprived of his title unless it is shown that he had actual knowledge of the fraudulent intent and design of those actually participating in the fraudulent transaction, and that constructive knowledge, such as given by the record, etc., is not sufficient. Whatever may be the rule in other jurisdictions, we recognize only the rule adopted by our Supreme Court.

The question of Alley's title then having been disposed of adversely to him, has he, under the facts and circumstances here disclosed, any standing in a court of equity for relief against the judgment lien, by reason of having paid off the $3,000 mortgage? We recognize that there is a decided conflict of authority upon this question. It must be conceded

that, when Alley purchased, he knew the *lis.pendens* was on record, which notified everybody that Tibbetts *claimed* that the deeds from David Terrill to Gray, and from Gray to Mrs. Terrill, were fraudulent and void, given without consideration, and executed for the purpose of hindering, delaying and defrauding Tibbetts and other judgment creditors of David Terrill; that a levy had been made on the premises under execution issued upon the Tibbetts' judgment; and that he knew of facts and circumstances which, if investigated, would have informed him that a transcript of the Tibbetts' judgment had been recorded. While this constructive knowledge must be attributed to Alley, there is not a word in the record that even tends to show that he was a participant in the frauds, or had any notice or knowledge whatever of the evil intent or design of the Terrills or Gray in executing the conveyances aforesaid. The record shows that he was not in the state when they were given and never knew either of the Terrills or Gray until about one week before he purchased the property. This was about ten months after the fraudulent deeds had been given. The written agreement of purchase between Mrs. Terrill and Alley was made October 3, 1901. Soon after this he went to his home in Missouri, and did not return until about October 28, 1901. In the meantime he had employed two attorneys to examine the title, one of whom had at one time been Mrs. Terrill's attorney. The other had never been attorney for either of the Terrills. Both advised him that Mrs. Terrill had a good title to the premises, and that the claim of Tibbetts as against Mrs. Terrill's title was unfounded and of no force or effect. He relied wholly upon this advice, and, believing Mrs. Terrill had a good title, made the purchase. The record does not tend to show that when Alley made the purchase he intended thereby to further the fraud previously consummated by the Terrills and Gray, or intended in any way to commit any fraud upon Tibbetts or any one else. Alley's situation is about as follows: By the Supreme Court decision he lost his title as

against Tibbetts' judgment lien, except the $2,000 saved to him through the homestead filing of Mrs. Terrill; also the $3,000 paid to Mrs. Terrill at the time he took his deed, and all taxes paid. We have just decided that he loses the $1,700 paid for improvements, and the $1,000 with interest, which he paid to release the second Dickinson mortgage, in addition to which he loses his costs and attorney's fees, which is doubtless quite an item. Must such losses now be augmented by the $3,000 which he paid to release the first Dickinson mortgage? Alley strenuously contends that he paid off this mortgage in the utmost good faith, relying on his attorneys' advice and believing that he had a good title to the premises.

It is well worthy of notice that the *lis pendens* was filed by Tibbetts after the suit was instituted by Mrs. Terrill against the sheriff of Rio Blanco county to restrain him from advertising or selling the property. The record shows the sheriff was enjoined from selling, and that he released the levy previously made under the execution, all of which Alley had full knowledge of *before* he paid off the $3,000 mortgage; so that in addition to the advice of his attorneys to the effect that Tibbetts' claim was of no force or validity as against Mrs. Terrill's title, which he had bought, he had the further assurance of a decree of a competent court of record, corroborating his attorneys' judgment in that regard.

So far as Alley is concerned, there appears to be no badge of fraud disclosed by the record. The Terrills and he were practically strangers to each other at the time of purchase. The record taken as a whole rather tends to show that Alley was free at all times from actual fraudulent design and free from any actual knowledge or information of evil or fraudulent intent on the part of any one connected with the transaction. The only serious charge that can be made against him is that he was lacking in common business acumen and foresight in his dealings with this property. He therefore should stand in a court of equity in a favorable light and receive its protection, provided it can relieve him without doing injustice

to other interests which are involved in the transaction. He stands alone in this litigation, both the Terrills and Gray having defaulted.

"As a general rule where the purchaser's title to the land fails he will be subrogated to the rights of the holders of liens or incumbrances which he has paid, or which have been paid out of the purchase money." *Am. & Eng. Enc. of Law,* vol. 27, p. 239.

The case of *Lynch v. Burt et al.,* 132 Fed. 417, 67 C. C. A. 305, is one in which the facts were quite similar to those found in the case at bar. The court said:

"The facts as clearly give Phipps an equitable claim or right to reimbursement as they exclude Burt therefrom. She (Burt) was an active and conscious participant in the fraud, while he (Phipps) was an entire stranger to it for more than three years after it was committed, and was at no time a conscious participant therein. He was constructively chargeable with knowledge of it, because he entered into the written agreement with Burt, and acquired her title pending the present suit, and subsequent to the Gotzian decree. He also advanced the money to pay Burt's counsel and other expenses in this suit, and was therefore constructively chargeable with her vexatious and wrongful effort to sustain the fraudulent transfer and to defeat the complainant's claim. The evidence, however, clearly establishes that in all this Phipps was acting in perfect good faith, without intent to defraud any one, in a mistaken belief in the honesty of Burt's claim and conduct, and under the approving advice of reputable counsel. * * * In pursuance of the agreement with Burt into which he had entered in good faith, acting upon an honest belief that he had thereby acquired a right and incurred an obligation so to do, Phipps discharged and removed this paramount lien by paying $17,168.33 in redemption from the sale thereunder. Under the rules stated, he was entitled as against complainant to reimbursement for that expenditure, and to have its repayment made a condition to the relief granted to complainant,

and declared a lien upon the lands as the Gotzian claim had been. He was also entitled to interest upon this sum from the date of the redemption," etc.

In the instant case Alley stood in the same relative position as did Phipps in the one cited. Phipps was not a participant in any way in the frauds perpetrated by Burt and others in having the title to the premises fraudulently deeded to Burt, for the purpose of cheating and defrauding the creditors of the judgment debtor Bartholomew Pickert, and he knew nothing about those deeds until three years after they were made and given. In the instant case Alley knew nothing about the fraudulent deeds between Gray, David Terrill and Mrs. Terrill, given for the purpose of cheating and defrauding the creditors of David Terrill, until about ten months after they were given. Phipps, at the time he made his contract with Burt, agreed with her to discharge the Davis mortgage then on record. At the time Alley took the deed in the instant case he agreed to pay the $3,000 mortgage.

In *Tompkins v. Sprout,* 55 Cal. 31, we have another case wherein the facts were noticeably similar to those of the case at bar. April 2, 1877, decision was rendered in favor of plaintiff Tompkins against defendant Charles Peterson, followed by final judgment on April 7th following. April 2nd, after decision, defendant conveyed the land to his brother Gustav Peterson. Gustav received the deed with full knowledge of Charles' intent to defraud the judgment creditor Tompkins and colluded with Charles in the fraud. April 24, 1879, execution on the judgment was issued, and the property sold thereunder, followed by sheriff's deed to plaintiff. Between the issuing of the certificate of sale and execution of sheriff's deed, and about September 28th, defendant Sprout purchased the land from Gustav Peterson, and paid full value therefor, but he had no actual knowledge of the fraud against Tompkins in the deed from Charles to Gustav, though he had both actual and constructive knowledge that the land had been sold at sheriff's sale as Charles'

property and that plaintiff Tompkins held the certificate of sale therefor. He also had actual knowledge of the judgment in favor of Tompkins against Charles. At the time of the sheriff's levy and sale of the premises, there was a valid mortgage on the property, which the defendant Sprout assumed and agreed to pay at the time he took his deed from Gustav, and he afterwards paid off the same and had it discharged of record. Under these facts the court held that Sprout should have been protected, and that if Tompkins sold the premises Sprout would have a first lien thereupon for the amount he had paid to release the mortgage. We quote from the opinion as follows:

"There being, at the time the plaintiff recovered his judgment against Charles Peterson, and at the time of the conveyance from Charles to Gustav Peterson, and at the time of the purchase by plaintiff under his execution sale, a valid, subsisting mortgage lien upon the property, it is obvious that the latter cannot be injured by requiring of him payment of the amount of the lien as a condition precedent to vacating the sale to the defendant. The court below expressly found that defendant had no actual knowledge of the fact that the conveyance from Charles to Gustav Peterson was fraudulent, and that the conveyance from the latter to defendant was constructively fraudulent only. In such case, a court of equity will protect the purchaser as well as the creditor, where, as here, both can be protected without injury to either. * * * Clements v. Moore, 6 Wall. 312 [18 L. Ed. 786]; Coiron v. Millandon, 19 How. 115 [15 L. Ed. 575.]

"Applying the principles thus announced to the facts of the case under consideration, it is clear that the court below should have imposed upon the plaintiff, as a condition to vacating the sale to defendant, and requiring a conveyance of the property from him to the plaintiff, the payment by the latter to the defendant of the amount paid by the defendant in the satisfaction and discharge of the mortgage lien existing upon the property during the time already stated. In this

way, and in this way only, justice can be done between the parties."

From 20 *Cyc.* 647, we quote the following:

"But where the purchaser's conveyance is merely constructively fraudulent, a court of equity in setting aside the conveyance will protect him, as well as the creditor, where both can be protected without injury to either, as by requiring that the purchaser be reimbursed for a prior incumbrance against the property which he has paid, or for taxes paid."

"When the fact of fraud is established in a suit at law, the buyer loses the property without reference to the amount or application of what he has paid, and can have no relief either at law or in equity. But when the proceeding is in chancery, the jurisdiction exercised is more flexible and tolerant. If it appears that the grantee has been guilty of no actual fraud, but the circumstances render it inequitable, equity, while it will set aside the conveyance, will protect the grantee to the extent of his payment." 14 *Am. & Eng. Enc. of Law,* 345.

See also 37 *Cyc.* 444.

None of the Colorado cases cited by counsel for either side involve the question we are now considering.

Plaintiff in error contends that the law is settled by the overwhelming weight of authority that if a purchaser expressly assumes the payment of valid mortgages of record at the time of purchase he thereby becomes the principal debtor, primarily and absolutely liable for the debt, and may not be subrogated to the benefit of the incumbrance upon making payment according to his contract. There is authority supporting the rule, but a number of decisions seem to have qualified it and held the same not to be inflexible, viz.:

*Matzen v. Shaeffer,* 65 Cal. 81, 3 Pac. 92; *Bressler et al. v. Martin et al.,* 133 Ill. 278, 2 N. E. 518; *Young v. Morgan,* 89 Ill. 199; *Cameron v. Holenshade et al.,* 13 Ohio Dec. 430, 1 Cin. R. 83; *Bryson v. Myers,* 1 Watts & S. (Pa.) 420; *Peet v. Beers,* 4 Ind. 46.

While the case of *Capitol Nat. Bank v. Holmes,* 43 Colo. 154, 95 Pac. 314, 16 L. R. A. (N. S.) 470, 127 Am. St. Rep. 108, deals with a situation but little similar to that existing in the instant case, I find the following language which indicates the court's leaning, on the doctrine of subrogation:

"We think that the authorities largely preponderate in favor of the proposition that although the deed recites that the purchaser shall pay off the mortgage as a part of the purchase price he is entitled to the subrogation;" citing cases from Illinois, New York, Minnesota, Indiana and California. In the instant case the deed to Alley recited that he assumed and agreed to pay this $3,000 mortgage. Strongly supporting this view are the following cases: *Young v. Morgan, supra; Bressler et al. v. Martin et al., supra; Matzen v. Shaeffer, supra.* In the last case cited the Supreme Court of California held that the vendee paying off the existing mortgage as part of the purchase price entitled him to the benefits of the mortgagee as against the judgment creditor of his vendor, although the mortgage had been released of record, the court saying:

"This presents a case in which the interests of the appellant required that the lien of the mortgage which she paid off should be kept alive. Her interests can only be fully protected by regarding the transaction in which she paid off the mortgage as an assignment of it to her, and the lien as being kept alive for her security and benefit. * * * We think this is one of the cases in which the satisfaction of a mortgage of record does not of itself prevent a court of equity from holding that the payment of it operated as an assignment of it to the person making the payment.

"There is nothing to indicate that appellant when she paid off the mortgage intended to purchase it, or to have it kept alive for her benefit. It does not appear that anything was said on that subject. She paid it off, and the mortgagee without her request satisfied it of record. But the payment was made for her benefit, or for that of respondent. If the

payment under the circumstances operated as an equitable assignment of the mortgage to her, she gets the benefit of it. Otherwise the respondent.   Now it is quite clear that she intended the payment of the mortgage should inure to her own, and not to his benefit.   She had in view her own, and not his interest.   And it is only by regarding the transaction as an assignment of the mortgage to her that her interests can be protected and maintained, and a court of equity will presume that it was intended she should reap the benefit of her investment.   Equity regards that as done which ought to be done, and looks to the intent rather than to the form.   There is no equitable ground on which the respondent could object to the mortgage lien being kept alive for the protection of appellant's interest, and the mortgage having been satisfied of record when it should have been assigned to appellant, it was not error to vacate the satisfaction."

If Alley acted in good faith in paying the mortgage, and with a desire to save his property from probable foreclosure, and under an honest belief that he had a good title thereto, then he should be protected by the court, if in so doing no injustice be done to Tibbetts.   The payment of the mortgage was an entirely separate and distinct act from the taking of the deed from Mrs. Terrill.   True, his deed gave him no title to the property as against the judgment lien, but it does not necessarily follow that because he failed to sustain the title which he thought he had, he thereby lost all right of subrogation which he might have otherwise possessed by reason of having paid off the mortgage.   The integrity of the mortgage is in no way questioned.   It was a valid lien of record when the transcript of judgment was recorded.   Alley is not charged with any kind of fraud in its payment.   Such being the case, wherein is Tibbetts prejudiced, or wherein does he lose any rights by requiring him to first pay this prior lien of $3,000 from the proceeds of the sale?

In the two cases last cited the Supreme Court without cavil or hesitation invoked equitable principles to administer

common justice and prevent a serious wrong and financial loss to one who was not in any way chargeable with any actual fraud, connivance or evil design, against the judgment creditor, and we say here that this mortgage against which no suspicion of invalidity is suggested was paid off by Alley as part of the purchase price under his agreement to do so, and even though nothing was said at the time as to whether or not he intended to rely upon the mortgage as a protection against Tibbetts' judgment lien, equity will presume that his intention in paying it off was to have it inure to his own benefit, and not that of the judgment creditor. It is clear that at the time Tibbetts' transcript of judgment was filed in Rio Blanco county, the mortgage was of record, in full force and effect, and the creditor could by no rule of law or equity have sold the property under the execution free from the lien thereof. It appears to be a well settled rule of law that a levy by execution or attachment is effective only as against the interest or title in real property which the judgment or attachment debtor has at the time of such levy or attachment. Under these circumstances we do not see why the rights of the judgment creditor Tibbetts should be enlarged, or the value of his judgment lien increased by the fraudulent acts of his judgment debtor. After a court has defeated the evil design of a judgment debtor to defraud his creditors, by setting aside a fraudulent deed given by the debtor for that purpose, we know of no rule of equity that would, as a penalty for the debtor's fraud, destroy the right of subrogation in a third person who has paid off a mortgage which was a paramount lien to that of the creditor's judgment.

Most of the cases cited by plaintiff in error involve transactions between fraudulent grantors and their immediate fraudulent grantees, wherein all are actual parties to the fraud; hence those cases do not apply to a state of facts such as we are now considering. The general rule seems to be that a fraudulent grantee who has actually and knowingly participated in the fraud has no standing in a court of equity

for any purpose, and will not be subrogated or otherwise protected for moneys paid in discharging liens existing at the time of the fraudulent purchase. We think, however, that a purchaser from such fraudulent grantee, who has only constructive knowledge of the fraud, and has no knowledge or information of the fraudulent intention of those perpetrating the same, and in no way participates therein, ought not to be denied relief in a court of equity, where such relief works no injury to others. We think the authorities cited amply support our conclusions and are well grounded in sound, equitable principles.

The judgment will be reversed and the case remanded to the District Court for further proceedings as the parties may be advised, and in case the property be sold under the Tibbetts judgment, there shall be first paid to defendant in error Alley, out of the proceeds thereof, the sum of $2,000, being the amount of the homestead exemption, plus the $3,000 which was paid to release the mortgage; the balance, if any, to be applied on the plaintiff's judgment; plaintiff in error to recover his costs.

*Reversed and Remanded.*

---

CUNNINGHAM, Presiding Judge, dissenting:

Finding myself unable to concur either in the reasoning of or the result reached by my associates, and being impressed with the importance of the rule announced in the majority opinion, and the precedent which it establishes, I have reluctantly concluded that it is my duty to set forth, at some length, my reasons for dissenting.

I shall not encumber this opinion with lengthy quotations from the opinion of the Supreme Court rendered in this case when it was before that body, as the same has been referred to in the majority opinion, and will be found in 44 Colorado 94, 96 Pac. 978, 104 Pac. 605. Summarized, the opinion of the Supreme Court squarely holds: 1. That Mrs. Terrill

held the property in trust for the creditors of her husband; 2, that in taking the property from Mrs. Terrill, Alley *wilfully* closed his eyes to the facts and circumstances surrounding the transfer of the property from Terrill to his wife. These are findings of fact. Upon these, and other similar findings of fact, the Supreme Court made findings of law to the effect that knowledge of the circumstances, such as Alley had, was equivalent to *actual* notice, and that, *"In such event, as we have seen, the law assumes that he had actual knowledge of such fraud."* Italics, wherever used, are mine. In the circumstances of this case, the Supreme Court announces the rule to be, quoting from 84 Fed. 860:

"Courts of equity do not permit a party to claim *any* benefits from his own ignorance of facts which he could have learned by exercise of ordinary prudence and diligence."

The Supreme Court's conclusions, if any authority were required to make the same binding upon us, finds ample support in the authorities, case and text.

"Knowledge or *implied* notice is equivalent to, and constitutes, participation, where the transfer is to one not a creditor." 20 *Cyc.* 471.

"Participation, as the term is used, need not be by some *affirmative* action on the part of the transferee in consummating the fraudulent intent of the transferer, but the transferee is a participator in the fraud if he takes the conveyance with actual notice of the grantor's fraudulent intent, *or under circumstances where the law will impute to him knowledge of the purpose of the transferer,* without his actively taking part in the fraudulent design of the transfer *other than the taking of it."* 20 *Cyc.* 471 (note). *Kansas Moline Plow Co. v. Sherman,* 3 Okla. 204, 41 Pac. 626, 32 L. R. A. 33.

Furthermore, the right to subrogation is never granted as a reward for negligence. *Fort Dodge Bdlg. Assn. v. Scott,* 86 Ia. 431, 53 N. W. 283.

The majority opinion, in so far as it treats of the money paid by Alley to redeem from the mortgage, appears to pro-

ceed upon the theory that unless one actually enters into a conspiracy, *and by word of mouth discusses the intentions and purposes of the one from whom he obtains his title,* that there can be no *actual* participation in the fraud of the grantor. The authorities last cited are opposed to this view.

My brethren may not approve of the opinion handed down by the Supreme Court in this case, but they ought to be bound by it, and they ought to cheerfully accept it as the law of this case; they have no more right to silently reverse an opinion of the Supreme Court, or ignore it altogether, than they have to, in terms, announce their dissent, and thus refuse to follow it. My conclusion therefore is that, if for no other reason than that the Supreme Court has laid down rules and made findings, both of fact and of law, which are binding upon us, the majority opinion in this case is wrong. But I find myself in hearty accord with the conclusions of the Supreme Court.

My position is that under the decision of the Supreme Court in this case, Alley was guilty of actual fraud, or guilty of such wilful carelessness as that the law imputes to him actual knowledge, and even the majority opinion nowhere combats the universal rule that one guilty of actual fraud may not invoke the doctrine of subrogation. On this point, at least, the authorities are harmonious.

The relief extended to Alley by the majority opinion presupposes a finding that he did not have actual knowledge; that he acted in good faith. These findings are squarely in the teeth of the opinion of the Supreme Court, as I read it.

I am persuaded that my associates have reversed the rules that apply, or ought to apply, in cases of this sort, viz: that:

"The burden is always on one who claims this equity of subrogation to show that he is entitled to it."—Sheldon on Subrogation (2nd Ed.) sec. 11.

"And also that the relief can be granted to him without prejudice to the rights of innocent parties."—Harris on Subrogation, p. 561.

That:

"To entitle a party to subrogation, his equity must be *strong,* and his case *clear.* In such applications great care should be taken by the court that the subrogation will *work no injustice to the rights of others.*"—*Knouf's Appeal,* 91 Penn. St. 78; *Lloyd v. Galbraith,* 32 Penn. St. 103; *Keeley v. Cassiday,* 93 Penn. St. 318;

That:

"The rights of one seeking subrogation must have greater equity than those who oppose him; the burden being upon the would-be subrogee to establish his right, for subrogation will be ordered only in a *clear case of pure equity.* The right is never allowed one who would thereby reap advantage in *any way* from his own wrong-doing. * * * As its purpose is only to prevent fraud or subserve justice, it will not be applied where its exercise would promote injustice, and thus can be applied only with a due regard to the legal and equitable rights of others."—37 *Cyc.* 371; *McNeil v. Miller,* 29 W. Va. 483, 2 S. E. 335:

That:

"The party seeking such relief must show a superior equity, for the equities being equal, the law will be allowed to take its course."—*Pritchett v. Jones,* 87 Ala. 317, 6 So. 75.

The majority opinion appears to proceed upon the theory that the burden was on Tibbetts to satisfy the chancellor that Alley had been guilty of fraud, and that his fraud would work to the injury of Tibbetts. But even under this perversion of the rules, as indicated by the above quotations, the majority opinion is wrong, for, as I shall presently show, the record demonstrates that Tibbetts *will* suffer injury.

In the majority opinion attention is called to the difficulty which would have confronted Alley, had he attempted by inquiry to ascertain whether or not Tibbetts' contentions were well-founded. There are two all-sufficient answers to this: 1, he could have refrained from purchasing the land until that

question was settled; he knew that there was an issue or question on that point, and if he found it difficult to get at the facts, no hardship would have resulted to him had he kept out of the controversy; 2, the Supreme Court has found (44 Colo. 104, 196 Pac. 978, 104 Pac. 605) that if Alley:

"Had pursued these investigations with *reasonable* skill and diligence, he would have ascertained that the consideration which Gray gave for the property was his unsecured promissory note, and the consideration which Gray received for the property when he conveyed it to Mrs. Terrill was the same note, which was still in the hands of Mr. Terrill. He would also have discovered the existence of the judgment in favor of appellant. He would thus have learned that the conveyances leading from Terrill to Mrs. Terrill were without consideration and void as to creditors, or that the consideration for the conveyance from Gray to Mrs. Terrill was paid by Terrill, which resulted in Mrs. Terrill's holding the property subject to the rights of her husband's creditors; that in either event the transaction was fraudulent so far as it affected the creditors. Aside from the knowledge possessed by the attorney, there were sufficient facts known to Alley before the purchase was consummated and the purchase price paid, to put him upon inquiry, *and to charge him with knowledge of facts which he might have acquired if he had exerted himself to the degree of ordinary diligence and prudence in making inquiry.*"

Moreover, my brethren appear to be oblivious to the difficulties that would confront Tibbetts, were he to attempt to establish actual fraud on the part of Alley. Paraphrasing from the original opinion: "He (Tibbetts) might have examined the records thoroughly, and made every effort to obtain information concerning the motives of Alley and the Terrills in giving the deed, and still. the limit of information so acquired would have been that Alley *claimed* and *contended* that the deed from Mrs. Terrill to him was given for a good consideration. It is more than probable that the question of

intent or evil design on the part of Mrs. Terrill or Alley (if there was any) in giving the deed, would have remained a closed secret to Tibbetts. He might have interrogated them concerning such intention and design, and in all probability would have failed to elicit any information from them on the subject. It is certainly a reasonable presumption that neither Mrs. Terrill nor Alley would have taken him into their confidence and divulged to him their fraudulent design (if they entertained one) and purpose in executing the deed." It is worthy of note that we have in this case no evidence whatever that Alley paid off this mortgage, to the lien of which the majority opinion subrogates him, with his own money, or in good faith, except his unsupported statement. It is conceded in the majority opinion, in treating of the improvements made by him, that his conduct was most extraordinary. But it was no more unusual in this respect than in respect to buying into this controversy, and paying off the mortgage before the maturity of the debt it secured. The unlimited opportunity for grave injustice being thus done to Tibbetts ought to make the court doubly cautious in the application of the benign doctrine of subrogation, for the books all hold that it is purely a benevolent rule. There is other evidence to be found in the majority opinion of extreme tenderness towards the supposed rights of Alley, for the writer of that opinion even appears to commiserate with Alley on the loss of the improvements which the majority opinion takes from him; on the sum of money which he says he paid to Mrs. Terrill in cash, and even on the attorney fees and costs which he has paid out in this case! What these items have to do with the matter is not clear; nor is it plain why sympathy should be extended to Alley for the money which he has voluntarily and contumaciously paid out in the way of costs and attorney fees, while overlooking similar expenditures which he has wrongfully forced Tibbetts to incur.

There are only two authorities that are cited in the majority opinion which, to my mind, sufficiently resemble the in-

stant case in their facts to require notice, and they may be readily distinguished. My associates appear to rely largely upon the case of *Tompkins v. Sprout,* 55 Calif. 31. It is apparent upon a reading of that opinion that the Supreme Court made much of the express finding of the trial court that:

"The defendant paid full value for the land and 'did not have actual knowledge of the fact that the conveyance from Charles to Gustav was fraudulent.' "

Here, if Alley did not have *actual* knowledge, he had what the Supreme Court has ruled was the *equivalent* thereto, and therefore, the Supreme Court says *the law imputes to him actual knowledge.* Proceeding upon and supplementing this finding by the trial court, the California Supreme Court, on p. 36, says:

"The court below expressly found that the defendant had no actual knowledge that the transfer from Charles to Gustav Peterson was fraudulent, and that the conveyance from the latter to the defendant was constructively fraudulent only. In such case, a court of equity will protect the purchaser as well as the creditor, where, *as here, both can be protected without injury to either."*

In other words, I take it that the California Supreme Court found that there was ample equity in the property to cover the claims of both parties. At least there is in the opinion nothing to negative this presumption. Another case much relied upon in the majority opinion *(Lynch v. Burt,* 132 Fed. 417, 67 C. C. A. 305), may be distinguished in the same manner as the California opinion.

The land in this case, with all the personal property there-on situate belonging to Mrs. Terrill (including household furniture, live stock, hay, etc.) was sold to Alley for $7,000. With the $2,000 deducted on account of the homestead right mentioned in the majority opinion, and $3,000 on account of the mortgage debt, it is not probable there will be anything remaining as the result of an execution sale to apply on the

Tibbetts' judgment which, fourteen years ago amounted to $6,378, besides costs, and now must amount to approximately $15,000.

The majority opinion is inconsistent in denying to Alley the value of his improvements, while allowing him for the money he advanced in redeeming the land from the mortgage. The authorities make no distinction between improvements, and money applied to the liquidation of liens which were upon the land at the time of the purchase, and especially in this case ought there to be no distinction made, since it was stipulated that the amount claimed by Alley by way of improvements was $1,700; that they *were permanent and necessary and enhanced the value of the property.* In the majority opinion it is said that Alley, "expended his money in improving the property, well knowing that Tibbetts was vigirously following up his claim and contention that Mrs. Terrill's title was fraudulently obtained, and was invalid against a judgment lien. * * * Under such circumstances, common prudence would have kept him from expending any money on the premises other than was absolutely necessary to prevent the loss of the same, until after the claims of Tibbetts had been finally determined. * * * He made such improvements at his own peril, so far as Tibbetts is concerned, and ought to suffer the consequences."

With this finding I fully agree; but did he not know, when he paid out his money by way of redeeming the land from the mortgage, that "Tibbetts was vigorously following up his claim and contention that Mrs. Terrill's title was fraudulently obtained?" There is nothing in the record to show when he made the improvements with reference to when he paid out the money by way of redeeming from the mortgage, but the record does disclose that he paid out a substantial part of the money *after this suit was started, and a year before the note was due,* that is to say, a year before the mortgage could have been foreclosed or his title jeopardized.

In denying to Alley what he had paid out for necessary improvements, which enhanced the value of the property by $1,700, Judge Hurlbut quotes the following from *Strike v. McDonald,* 13 Har. & G. (Md.) 142, at 193:

"The quoted passage Sugd. 525, furnishes a sound, practical rule for rejecting claims for improvements, where the transaction is tainted with fraud. It is expressed nearly in these words: If a man has acted fraudulently, and is conscious of a defect in his title, and with that conviction on his mind expends a sum of money in improvements, he is not entitled to avail himself of it."

Having quoted, without qualification, the above language from the Maryland case, I suppose my associates concede its applicability to the defendant in error, Alley. Then, we have this remarkable conclusion: that where a transaction is tainted with fraud, and where a man has acted fraudulently, and is conscious of a defect in his title, and with that conviction on his mind, expends a sum of money in paying off a mortgage, he *is* entitled to avail himself of the benevolent doctrine of subrogation, but where he makes valuable improvements, which are necessary to the estate, and which actually enhance the value of the estate, he is not!

The highest court of this country has clearly indicated that as between improvements placed upon land purchased under the circumstances presented by this case, and money paid out to lift an encumbrance therefrom, the law makes no distinction; and that court has expressly ruled that a man who has acted fraudulently, "and with that conviction on his mind," can recover for neither of these items. In *Railroad Co. v. Soutter,* 13 Wall, 517, 20 L. Ed. 543, Mr. Justice Bradley, speaking for the court, uses this language:

"Was it ever known that a fraudulent purchaser of property, when deprived of his possession, could recover for his repairs or improvements, or for encumbrances lifted by him whilst in possession? If such a case can be found in the books, we have not been referred to it. Whatever a man

does to benefit an estate under such circumstances, he does in his own wrong. He can not get relief by coming into a court of equity."—20 *Cyc.* 470; *Gilbert v. Hoffman,* 2 Watts (Pa.) 66, 26 Am. Dec. 103; *Guckenheimer v. Angevine,* 81 N. Y. 394; Bump on Fraudulent Conveyances, § 198; *Weiser v. Kling,* 38 App. Div. 266, 57 N. Y. Supp. 48; *Roller Mills v. Ward,* 6 N. D. 317, 70 N. W. 271; *Seivers v. Dickover,* 101 Ind. 495; *Goble v. O'Conner,* 43 Neb. 59, 61 N. W. 131; *Beidler v. Crane,* 135 Ill. 99, 25 N. E. 655, 25 Am. St. Rep. 349; *Sands v. Codwise,* 4 Johns. (N. Y.) 536, 4 Am. Dec. 305.

There is yet another reason which, in my judgment, ought to bar Alley from the right to invoke the doctrine of subrogation, at least as to $1,000 of the sum which the majority of the opinion allows him; the $3,000 which the majority opinion concludes he ought to recover, was represented by three promissory notes. The last note, of $1,000, was paid by him (if paid at all) in two installments, *the first being paid some eighteen months before the maturity of the note, and the last installment a year before maturity, and five months after this action was brought.* I have discovered no authority which permits one, under circumstances of this kind, to invoke the doctrine of subrogation.

There is still another reason which is, in and of itself, sufficient to defeat the claims of Alley to subrogation, and that is, that at the time he filed his original answer in this case, to-wit, March 21, 1903, he had paid; as the record shows, every dollar that he now claims by way of subrogation, *i. e.,* he had, according to his evidence, extinguished the mortgage by paying all of the notes which it was given to secure, save and except a small balance of less than $350 on the last of the three notes, and this balance was paid before the issues in the case were joined. In the original answer no claim whatever is made by Alley that he had paid off the mortgage and desired that it be kept alive for his use and benefit; nothing whatever is said by him, or on his behalf, concerning the question of subrogation, until the Supreme Court, in April, 1908, (some

five years after he filed his original answer) handed down its opinion in this case. Then, for the first time, and in that court, he sought, by motion, to claim and have enforced in his behalf the doctrine of subrogation. The Supreme Court very properly refused to consider his demand, because, as it says, "there is nothing in the pleadings concerning these encumbrances." Whereupon, he goes back to the District Court, and on September 7, 1909, after a lapse of seventeen months more, files his supplemental answer, setting up the facts upon which he now bases his claim of right to invoke the doctrine of subrogation. In other words, *for more than six years,* while this litigation was pending, he made no claim or mention that he had paid off the mortgage and desired to be subrogated to the rights of the mortgagee. On the contrary, seven times in his original answer he insists upon the illegality and utter want of virtue in Tibbetts' *lis pendens* execution, etc., and upon that defense alone went forward to trial. The original answer of Alley, considered in connection with the opinion rendered by the Supreme Court in this case, conclusively shows that the only mistake that Alley made was a mistake of *law,* not a mistake of *fact,* and the rule that one may not invoke the doctrine of subrogation when his only contention is that he has made a mistake in law, is too elementary to require the citation of authorities.

Innocence of actual fraud *may,* under certain circumstances, entitle a purchaser of mortgaged land who pays off a debt thereon to the right of subrogation, but my associates seem to think it *must* do so, regardless of the grossest and most wilful negligence, and in the face of the clearest possible proof of waiver.

"Subrogation, being an equity springing from the relation between the parties, and created and enforced for the benefit and protection of the one in whose favor it is originated, may be asserted or waived at pleasure, either expressly *or by implicaton.*"—37 *Cyc.* 383.

"The right of subrogation may be lost by the waiver of the party entitled to it. * * * *A long delay without action will be fatal to a claim of subrogation."*—Sheldon on Subrogation, Sec. 41.

Alley's right of subrogation, if any he had, accrued when he paid the last installment on the mortgage.

"The surety's right of subrogation accrues upon his payment; and as to his principal the statute then begins to run against him, and he should then call at once for the securities, if he desires to be subrogated to them." —Sheldon on Subrogation, Sec. 110.

He paid the last installment January 5, 1903. Six years and eight months elapsed before he attempted to assert his alleged right of subrogation. His supposed right was then barred by the statute of limitations.

"The right of subrogation will be barred by the statutory period of limitations like any other right."—Sheldon on Subrogation, Sec. 110.

If it be said that Tibbetts, by not pleading the statute of limitations, waived his rights to invoke the same, I reply: Alley had waived his right to invoke the equitable rule of subrogation long before Tibbetts was called upon to plead the statute of limitations. But, the truth is, Alley has never asked to be subrogated to the rights of the mortgagee. The prayer of his original answer reads as follows:

"Wherefore, this defendant prays that he go hence without day, with his costs herein expended."

He does not even pray for general equitable relief. And his amendment, filed September 7, 1909, contains no prayer; it is simply an insert in the original answer. So, the climax of Alley's good luck in this piece of litigation comes in the form of a relief for which he has not asked! Having chosen his weapons of defense (specific and general denials *as to the legality of Tibbetts' claims*) and having signified his satisfaction with the battlefield, he goes forth to a seven-year war, at the end of which, having lost everything for which he con-

tended, instead of capitulating, he draws an ancient and forgotten weapon—a stale, so-called equity—and renews the fight, achieving in the end, if the majority opinion shall stand, a signal victory. If he has not already done so, Alley ought to adopt as his coat of arms a rusty sword, with the legend emblazoned thereon, "If at first you don't succeed, try, try again." So far as I am now able to recall, this is the first instance where a litigant has successfully invoked his own *laches* and his mistake of law to arrest the statute of limitations.

From the time the Supreme Court handed down its opinion in April, 1908, until this good hour, Alley has held Tibbetts at bay by advancing an issue or contention which might just as well have been presented and determined on the first trial, and all this time he has benefited by retaining possession of the land, (for the use of which he is not required to account) thus preventing its sale under execution. In the meantime, Tibbetts' judgment has more than doubled, and can now never be made by the sale of the land. In *Lake County v. Johnson,* 31 Colo. 184, 71 Pac. 1106, our Supreme Court expressly ruled that a judgment is conclusive respecting *omitted defenses,* as well as defenses that were *in fact offered,* if the omitted defenses *might* have been plead in the action in which the judgment was obtained.

"A valid judgment for plaintiff definitely and finally negatives every defense, objection or exception which *might* and *should* have been raised against the action; and this is true not only with respect to further or supplementary proceedings in the same cause, but for the purpose of every subsequent suit between the same parties, whether founded upon the *same* or a *different cause* of action."—23 *Cyc.* 1196.

The above quoted text from *Cyc.* is supported by hundreds of citations, from practically every state in the Union.

"The rule is often stated in general terms that a judgment is conclusive not only upon the question actually contested and determined, but *upon all matters which might have*

*been litigated and decided* in that suit; and this is undoubt-
edly true of all matters properly belonging to the subject of
the controversy and within the scope of the issues, so that
each party must make the most of his case or defense, bring-
ing forward all his facts, grounds, reasons or evidence in sup-
port of it, on pain of being barred from showing such omitted
matters in a subsequent suit; and it is also true that where
the second suit is upon the same cause of action, all matters
which *might* have been litigated are *conclusively settled by
the judgment;* and that generally the estoppel applies where
matters which should have been urged as a defense in the first
suit are attempted to be made the basis of a second action, or,
according to some of the authorities, where defenses which
were available against an adverse claim in the first suit, but
not then set up, are sought to be used in a second action,
either by way of defense, *or as the foundation of a claim for
relief."*—23 *Cyc.* 1295.

Lake County v. Johnson, *supra,* is cited as supporting.
and it does support, the last rule announced in the above quo-
tation.

It is true that Tibbetts, in this case, has not interposed
estoppel or *res adjudicata* as a defense, but his failure in this
respect does not impress me as more serious than the failure
of Alley for more than six years to claim the right of subro-
gation, and his entire failure, up to the present time, to even
ask for that right.

The majority opinion sends this case back, "for further
proceedings as the parties may be advised." I shall be
greatly surprised if Alley does not incubate another time-con-
suming alleged equity, and project this litigation five years
or more further into the future, the while he holds possession
of the property and receives the income therefrom.

It is my conclusion that the judgment of the trial court
should be reversed, unqualifiedly, and the case remanded with
instructions to carry out the directions of the opinion of the

Supreme Court, permitting Alley what was awarded him by that court, and nothing more.

Decided April 13, A. D. 1914. Rehearing denied May 11, A. D. 1914.